PAUL ROBERT GERMANO,        :
       Plaintiff,         :
                    :
   v.                  :       CASE NO. 3:09cv1316 (SRU)
                    :
WARDEN JAMES DZURENDA, et al.,  :
       Defendants.     :

## RULING ON DEFENDANTS' MOTION TO DISMISS

Paul Robert Germano ("Germano"), currently incarcerated at Garner Correctional

Institution ("Garner") in Newton, Connecticut, filed an amended complaint *pro se* under 42

U.S.C. § 1983 (2000) claiming that the defendants[1] were deliberately indifferent to his mental

health needs, violated his due process rights, conspired and retaliated against him, committed

assault and battery against him, and intentionally inflicted emotional distress.[2]  The defendants

move to dismiss all claims in the amended complaint.  For the reasons that follow, defendants'

motion is granted in part and denied in part.

## I.  Standard of Review

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is designed

"merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which

---

[1]  The defendants named in the amended complaint are: Warden James Dzurenda; Nurse Kathy Cassidy; Dr. James Oliveira; Dr. Kristine Matthews; Counselor Palmieri; Clinical Social Worker Bill Kompare; Nurse Kathy Benner; Dr. Dan Bannish; Director Patricia Ottolini; District Administrator Mark Strange; Nursing Supervisor Pat Morris; Health Services Administrator Richard Bush; Dr. Steven Helfand; Clinical Social Worker Debbie Douglas; Clinical Social Worker Nick Seri; Nurse Judith Malloy; Nurse Tony Puco; Unit Manager Stacey Marmora; Captain Gifford Travaglin; Dr. Mark Buchanan; and Dr. Raymond Castro.

[2]  A liberal reading of the plaintiff's complaint also suggests a First Amendment claim, although he does not explicitly allege such.

might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and decide whether it is plausible that the plaintiff has a valid claim for relief. *Ashcroft v. Iqbal*, --- U.S. ---, 129 S. Ct. 1937, 1949-50 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also Iqbal*, 129 S. Ct. at 1940 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted). *Plausibility* at the pleading stage is nonetheless distinct from *probability*, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id*. at 556 (quotation marks omitted).

## II.    Background

The following facts are taken from the amended complaint and are assumed to be true for purposes of the motion to dismiss.

A.  Relationship with Nurse Kathy Cassidy

At some point in 2005, Cassidy began to work at Garner and developed a close relationship with Germano.   Amend. Compl. at ¶ 14.  Germano gave Cassidy poems, letters, notes, and a necklace, and the two made plans to continue their relationship when Germano was released from prison.   *Id.* at ¶¶ 15-16.

On March 23, 2007, Cassidy gave Garner officials a card the plaintiff had given her through his mother.  *Id*. at ¶ 25.  Cassidy pretended not to know why the plaintiff had given her the card.  *Id*.

On March 26, 2007, Germano was called into Travaglin's office to discuss his relationship with Cassidy.  *Id.* at ¶ 27.  The plaintiff's psychiatrist, Matthews, was also in attendance.  *Id*.  Germano told Matthews and Travaglin the details of his relationship with Cassidy.  *Id*.  Due to Germano's mental state, officials placed him in the Inpatient Mental Health Unit at Garner pending an investigation into the incident with Cassidy.  *Id*.

The investigation into Germano's relationship with Cassidy was closed on March 30, 2007.  *Id*. at ¶ 29.  Although Germano's mother had phone records that would have shown calls with Cassidy, Travaglin ended the investigation before receiving those records.  *Id*. at ¶ 30.  Travaglin also did not speak with Nurse Anita Perrin, a co-worker of Cassidy's, who had knowledge of Germano and Cassidy's relationship.  *Id.*  Cassidy was not disciplined for the incident, but Germano received a no-contact order.  *Id*. at ¶ 29.  Germano was then released back to the H-unit.  *Id*. at ¶ 32.

On April 4, 2007, Travaglin asked Germano to sign an order indicating he would have no further contact with Cassidy.  *Id*. at ¶ 37.  Germano refused, because he believed signing the

order would constitute an admission of guilt. *Id.* Travaglin told Germano that if he signed the order, Travaglin would hide the paperwork so that no one would know that Germano had signed it. *Id.* Germano still refused. *Id.*

On April 9, 2007, a ten-page letter Germano had sent to Cassidy on March 22 was returned to Garner for lack of postage. *Id.* at ¶ 44. Germano received a disciplinary ticket for tampering with the mail, and was sent to segregation from April 9, 2007 to April 18, 2007. *Id.* Germano pleaded not guilty to the charge, and filed an appeal. *Id.* at ¶ 45. Although the appeal was submitted on April 30, 2007, it was not delivered to Travaglin until July 6, 2007. *Id.* at ¶¶ 41, 68.

While Germano was in segregation, he wrote to Dzurenda and asked Dzurenda to reopen the investigation into Germano's relationship with Cassidy. *Id.* at ¶ 46.

On April 24, 2007, Germano submitted a level one grievance pertaining to the Cassidy investigation. *Id.* at ¶ 60. That grievance was returned without disposition on May 3, 2007. *Id.* On May 15, 2007, Germano sent a twenty-five page report to Central Security Division in Wethersfield, Connecticut, asking them to reopen the Cassidy investigation. *Id.* On June 18, 2007, Germano was interviewed by Central Security Division Captain Quiroz. *Id.* at ¶ 70. In that interview Germano stated that Travaglin was incompetent, and Matthews was a witness. *Id.* Matthews was displeased to hear that Germano had used her name in his meeting with Quiroz. *Id.* at ¶ 67.

The Central Security Division investigation into the Cassidy incident ended in 2008. *Id.* at ¶ 183. The investigators found that the plaintiff's allegations could not be substantiated, but nevertheless removed the no-contact order from the plaintiff's file. *Id.*

On June 13, 2007, Germano submitted a level one grievance pertaining to Travaglin's failure to pick up the April 30th appeal. *Id.* at ¶ 68. The grievance was returned to Germano on June 22, 2007, without a disposition. Germano was informed at that time that Travaglin had already picked up the earlier appeal. *Id.* Germano's mother then called Dzurenda to complain. *Id.*

Sometime after July 9, 2007, another inmate informed Germano that Cassidy had a message for Germano. *Id.* at ¶ 95. Germano informed Dzurenda about this incident, but Dzurenda failed to investigate it. *Id.*

On November 30, 2007, Germano resubmitted his level one grievance about the Cassidy investigation. *Id.* at ¶ 121. That grievance was denied. Germano submitted a level two grievance on January 2, 2008, and another level two grievance on January 4, 2008. *Id.* He received no response. *Id.* On February 20, 2008, Germano submitted a level three grievance; again, he received no response. *Id.* Germano alleges that Strange has those grievances; Strange told Germano's mother that he would look at them, but he never did. *Id.* at ¶¶ 122-23.

On December 20, 2007, Germano's mother complained to Boutin about her son's mental treatment and the Cassidy incident. *Id.* at ¶ 147. The next day, Morris assigned Cassidy to work in Germano's housing unit, causing Germano emotional turmoil. *Id.* at ¶¶ 147-48. Cassidy switched with another nurse and was gone by the end of the day. *Id.* at ¶ 149.

When a prison employee asked Morris why Cassidy had been put on Germano's block, Morris answered that she was unaware that Cassidy was not supposed to be put on Germano's block. *Id.* at ¶ 152. Germano believes that Morris was lying, because it was Morris who helped Cassidy obtain a no-contact order against Germano. *Id.*

Germano submitted several grievances regarding the matter: an emergency grievance on December 23, 2007, a level one grievance on January 2, 2008 (denied), a level two grievance on January 10, 2008 (returned without disposition), a resubmitted level two grievance on January18, 2008 (no response), and a level three grievance on March 18, 2008 (again, no response). *Id*. at ¶ 151. Again, Germano believes Strange had been holding the level two and level three grievances. *Id*. Germano also wrote a letter to Strange, but received no response. *Id*. at ¶ 153.

B. Medical and Mental Health, and Conditions of Confinement

1. *Treatment Plan*

Germano has been diagnosed as suffering from borderline personality disorder. *Id.* at ¶ 24. Matthews treated Germano for this condition at Garner from March 23, 2006 to June 27, 2006, and from December 19, 2006 until July 9, 2007. *Id.* at ¶¶ 19-20. Matthews saw Germano approximately once a week during these time periods. *Id.* at ¶ 21.

After the incident with Cassidy, Dr. Hair wrote an order for Germano's therapy to increase. *Id*. at ¶ 31. At that time, Germano began receiving daily sessions with Matthews, but she refused to let him discuss either Travaglin or Cassidy. *Id*. at ¶¶ 32-34.

On April 4, 2007, Palmieri refused to let Germano meet with Matthews because Germano was carrying a cup. *Id*. at ¶ 35. Germano insists that there was no rule against carrying cups into counseling sessions, and that Palmieri kicked Germano out of counseling sessions with Matthews on five other occasions. *Id.* at ¶¶ 35, 63. Matthews did not intervene, and Germano believes she may have directed Palmieri's actions. *Id*. That same day, Matthews approached Germano in his cell and angrily told him that she believed he had manipulated Hair into increasing the number of therapy sessions Germano received. *Id*. at ¶ 36.

6

That night Germano wrote Matthews a letter accusing her of unprofessional conduct, and slipped it under her door. *Id*. at ¶ 39. When Matthews read the letter she became angry and, along with Oliveira, started a "Crisis Intervention Team" for Germano. *Id*. at ¶ 40. Germano believed she did so in an attempt to get someone else to become his psychiatrist. *Id*.

On April 5, 2007, Oliveira's treatment team began. *Id*. at ¶ 42. The team would not permit Germano to speak about the incident with Cassidy. *Id*. at ¶¶ 42, 50. Germano was told that Oliveira, Matthews, and Benner would see him every week for several weeks. *Id*. at ¶ 42. At the first meeting, Oliveira asked Germano how his medication was, and Germano responded that it was fine. *Id*. Germano now says that he would have accepted a low-dose antipsychotic if it had been offered to him. *Id.*

Although Germano repeatedly asked Matthews what form of therapy she was using with him, he was given only a vague answer. *Id*. at ¶ 47. On April 23, 2007, Matthews did allow Germano to quickly review his medical chart. *Id*. at ¶ 52. At that time, Germano asked Matthews to stop the intervention therapy with Oliveira and Brenner. *Id.* Matthews said that she would speak to Helfand about starting Germano on a twice-a-week behavioral plan. *Id*.

Following the April 23rd session, Matthews gave Palmieri information regarding Germano's mental health issues, and entered a false notation in Germano's medical records indicating that Germano had agreed to decrease his sessions with her to once every two weeks. *Id*. at ¶¶ 53, 58.

On April 26, 2007, the plaintiff endured a crisis intervention session with Oliveira, Matthews, and Benner, in which none of the three spoke. *Id*. at ¶ 61. The session infuriated the plaintiff, and their behavior was never explained to him. *Id*.

At some point Palmieri accused Germano of wanting to have sexual relations with Matthews. *Id*. at ¶ 62. On March 6, 2008, Germano wrote to Unit Manager C.S. Jennett (who is not a party to this litigation) requesting the names of inmates who had stated that the plaintiff was stalking Matthews. *Id*. at ¶ 65. Jennett denied having heard any such information. *Id*. On March 21, 2008, Germano asked Matthews for the inmates' names. *Id*. at ¶ 66. Matthews said that for security reasons she could not release those names. *Id*.

In May 2007, Germano went to his final crisis intervention session. *Id*. at ¶ 69. That session was attended by Oliveira, Benner, and Matthews. *Id*. There, Oliveira stated that in the future Germano would be limited to thirty-minute, biweekly therapy sessions with Matthews, despite the fact that persons with borderline personality disorder are commonly treated with weekly sessions. *Id.* Oliveira also failed to offer Germano any medication. *Id*. Germano says that he only accepted this treatment because there were veiled threats that his therapy would be completely terminated if he did not. *Id*.

On May 21, 2007, Germano had his first thirty-minute session with Matthews. *Id*. at ¶ 72. Germano insisted that the time was too short to address his psychological needs, and asked Matthews to lengthen the therapy time. *Id*. Matthews promised to speak with Helfand about the matter, but the sessions were never lengthened. *Id*. Germano argues that this decision was contrary to the American Psychiatric Association's treatment guidelines for individuals with borderline personality disorder. *Id*. at 75.

On June 5, 2007, Matthews told Germano that if he ever felt suicidal, he should page her, and if she was not in the building, then Germano should speak with a social worker. *Id*. at ¶ 79. On June 26, 2007, the plaintiff had a mental health incident and repeatedly asked to have

Matthews paged. *Id.* at ¶ 81. Matthews responded to the page and said that she would arrive shortly, but never came. *Id.* A few hours later, Germano tried to hang himself with a headphone extension cord. *Id.* at ¶ 82.

On July 2, 2007, Germano spoke with Matthews about his suicide attempt. *Id.* at ¶ 84. Matthews failed to take his attempt seriously, and did not have staff members search Germano's cell for the extension cord. *Id.* Matthews did fill out a mental health treatment plan, and recommended weekly therapy sessions. *Id.* at ¶ 85. She did not inform Oliveira about the suicide attempt. *Id.* at ¶ 89.

In June or July of 2007, Germano's mother contacted Helfand about Germano's suicide attempt. *Id.* at ¶ 89. As a result, on July 6, 2007, Oliveira and Benner met with Germano. *Id.*

On July 9, 2007, Matthews and Oliveira informed Germano that his therapy sessions with Matthews were going to be terminated because they had not produced the desired outcome. *Id.* at ¶ 91. On July 25, 2007, Germano met with Helfand, Oliveira, Malloy, Puco, and Dr. Mennesson (who is not a party to this litigation). *Id.* at ¶ 96. At that meeting, Germano was told that Kompare would replace Matthews as his clinician. *Id.*

On July 27, 2007, Germano saw Cassidy, and began repeatedly punching the windows in his cell. *Id.* at ¶ 97. Castro ordered x-rays for the plaintiff on July 31, 2007. *Id.* The x-rays showed damage to his hand. *Id.* at ¶ 98. At no time was the plaintiff offered medication that would calm him. *Id.*

Germano filed a number of grievances relating to the termination of his therapy with Matthews. *Id.* at ¶ 99. Those included a level one grievance, filed on August 2, 2007; a level two grievance, filed on September 23, 2007; and a level three grievance, filed on October 23,

2007.  *Id*.  All were denied.  *Id*.  Germano alleges that Kompare was not an adequate therapist, and ignored Germano's discussions of suicide.  *Id*.  Kompare only met with Germano approximately every two weeks.  *Id*. at ¶ 105.

On August 28, 2007, Germano wrote to Bush.  *Id*. at ¶ 107.  Bush responded that the "frequency of contact is determined by patient need and treatment plan/treatment team."  *Id*.

On October 2, 2007, Germano spoke with Helfand and informed him that he could not connect with Kompare, and could only speak openly with a female therapist.  *Id*. at ¶ 110. Helfand told Germano he would attempt to find a female therapist to treat him, and would try to move him to the top tier of the housing unit.  *Id*.  Helfand did not fulfill either of those promises. *Id*.

On October 10, 2007, Germano received a disciplinary ticket for threats made to Malloy. *Id*. at ¶ 115.  He was also sent to an inpatient mental health unit and put on suicide watch.  *Id*. The disciplinary ticket eventually was dismissed because of Germano's mental health problems. *Id*.

On October 16, 2007, Germano's mother wrote to Helfand, and on October 22, 2007, to Deputy Commissioner Brian Murphy, stating that her son needed help.  *Id*. at ¶ 114.  Dzurenda responded to those letters, stating that he would try to accommodate Germano's request for a top-tier placement when possible, but that given Germano's past behavior, safety reasons precluded Matthews from acting as Germano's therapist.  *Id*.  On November 2, 2007, Kompare began having weekly sessions with Germano.  *Id*. at ¶ 143.

On November 16, 2007, Germano was forced to see Malloy in order to receive his medication.  *Id*. at ¶ 125.  Malloy antagonized Germano by asking him what was troubling him,

which caused Germano to explode into a rage and make threats regarding Cassidy.  *Id*. at ¶ 126.

Marmora came to Germano's cell later that day and told him that he would be receiving a disciplinary ticket, and would be sent to segregation.  *Id*. at ¶ 129.  At that point, Germano smashed his television, causing cuts to his left arm.  *Id*.  He thinks that he briefly blacked out, and cannot remember all of the events of that day.  *Id*.

On November 28, 2007, Germano again wrote to Bush, asking him for help.  *Id*. at ¶ 144. In response, Bush wrote that Germano should refer to his treatment team, and build a positive therapeutic alliance with treatment providers.  *Id*.

On December 14, 2007, the plaintiff refused to meet with Malloy.  *Id.* at ¶ 145.  Although Germano refused to speak to Malloy when she came to his cell, she refilled his medications.  *Id.* Germano sees this as evidence that she did not actually need to speak with him when he sought medication on November 16.  *Id.*

Also on December 14, 2007, Germano's mother wrote to a doctor who is not a party in this litigation about an inmate who repeatedly sang hymns in his cell.  *Id*. at ¶ 146.  On February 13, 2008, Germano approached Marmora about the same issue.  *Id*.  On April 2, 2008, Germano again wrote to Marmora, asking her to silence the inmate who sang hymns.  *Id*. at ¶ 172.  Despite that, no officials at the prison attempted to stop the other inmate's singing.  *Id*. at ¶¶ 146, 172.

In February 2008, the plaintiff began punching the walls of his cell, and had to have his hands x-rayed.  *Id*. at ¶ 154.  Afterwards he was not put into a different risk zone, moved to a different cell, or given a different therapist.  *Id*.

On February 19, 2008, a nurse noticed Germano had bruises on his arm.  *Id.* at ¶ 157. Although Germano received the bruises from stabbing himself with pencils, he lied and told the

nurse that he had been accidentally injured. *Id.*

On February 22, 2008, Germano's mother called and complained that he was suicidal, and he was taken to an inpatient mental health unit. *Id.* at ¶ 158. While there, Germano met with Bannish. *Id.* at ¶ 160. Within forty-five minutes of meeting Germano, Bannish developed a crisis theory. *Id.* He told Matthews to ignore requests from Germano and to refer Germano to Kompare if Germano requested anything. *Id.* Bannish also recommended that Germano be put into a "start now" group. *Id.* at ¶ 161. On February 29, 2008, Germano's mother emailed Bannish and explained why she did not believe Germano's needs were being met. *Id.* at ¶ 162. Bannish did not respond. *Id.* Germano's mother emailed Bannish again on March 4, 2008, warning that Germano would not be safe in his current housing situation. *Id.* at ¶ 165. Again, Bannish did not respond.

On March 25, 27, and 28, 2008, Germano wrote to Helfand, Bush, and one other doctor. *Id.* at ¶ 167. All responded, and told him that he should refer to his treatment team. *Id.* Germano also wrote to Matthews on March 27, 2008; April 1, 2008; April 4, 2008; May 2, 2008; May 16, 2008; May 22, 2008; and May 31, 2008. *Id.* at ¶ 170. Matthews ignored those letters. *Id.*

On March 28, 2008, Germano's mother wrote to Ottolini, asking for help for Germano. *Id.* at ¶ 169. Ottolini did not respond. *Id.*

On April 7, 2008, Germano cut his arm open. *Id.* at ¶ 174. Germano was taken to the University of Connecticut and given stitches. *Id.* When Germano returned to Garner, he was put on suicide watch. *Id.* at ¶ 175.

In late April and early May 2008, Dr. Burns, an individual not party to the lawsuit,

increased the dosage of one of Germano's medications and changed another. *Id.* at ¶ 178. After the change in medications, Germano did not attempt to harm himself or punch walls. *Id.* at ¶ 179.

In mid- to late-2008, Germano's mother and Attorney David Derosa met with Burns, Dzurenda, Jennett, and Assistant Attorney General Terrence O'Neil. *Id.* at ¶ 200. At that meeting, Dzurenda said that to the best of his knowledge Germano had never been on the top-tier housing. *Id.*

On November 3, 2008, Germano got into another altercation with Benner. *Id.* at ¶ 200. Germano used an expletive to request that a recreational therapist turn down the volume of a compact disc ("CD") player. *Id.* Benner responded that the therapist could play his music as loudly as he wished, and proceeded to turn the CD player up to full volume. *Id.* Germano considers this treatment to be "mental torture," and says that it sent him into a "frenzy." *Id.* The interaction between the two lasted approximately fifteen minutes. *Id.*

On December 25, 2008, Germano filed a level one grievance regarding the health service review. *Id.* at ¶ 217. That grievance was denied. He filed a level two grievance on January 20, 2009, which was also denied. *Id.* Finally, on February 15, 2009, he filed a level three grievance, to which Bannish never responded. *Id.*

In 2009, Germano began to receive veiled threats that if he caused any trouble, he would be transferred to another correctional facility. *Id.* at ¶ 218. Germano filed several grievances in connection with those threats, because he believed that he would receive a lower quality of mental health care at another facility. *Id.*

2. *Housing Location*

13

During much of this time Germano had been confined in H-unit, a level three housing unit, even though he had been assigned a mental health level score of four. *Id*. at ¶ 23. After speaking with Matthews in April 2007, Palmieri had Germano moved to the bottom tier in the C-unit. *Id*. at ¶ 53. Matthews refused to move Germano to the top tier. *Id*. at ¶ 54. Matthews also failed to inform Oliveira that Germano was to be kept on a top tier because it was quieter and less stressful than the bottom tier. *Id*. at ¶¶ 55, 59. Without this information, Oliveira determined there was no reason Germano could not remain in a cell on the bottom tier. *Id*.

On May 22, 2007, Germano had an emotional breakdown brought on by the traffic near his bottom tier cell, and attempted to eat a silica gel packet from his sneaker box. *Id*. at ¶ 76. Another inmate informed Matthews of the situation; although Matthews came to Germano's cell to speak with him, she did not alert the staff to his suicide attempt. *Id*. The inmate then contacted Benner, who came to Germano's cell and took the gel packet from him. *Id*. When Benner made an entry about the matter, she neglected to mention Matthews' role in the incident. *Id*.

On May 23, 2007, Dr. Bogdanoff, an individual not a party to this lawsuit, moved Germano back to the upper tier of the housing unit. *Id*. at ¶ 77. On May 29, 2007, Palmieri attempted to move Germano back to the bottom tier, but a social worker intervened to stop the transfer. *Id*. at ¶ 78.

On July 25, 2007, Mennesson, Helfand, Oliveira, Malloy, and Puco told Germano that he had been approved to move to C-block, top tier, in a single cell. *Id*. at ¶ 90. Once Germano was placed on the C-block, Marmora made him take a cell on the bottom tier. *Id*. at ¶ 93.

During Germano's October 2007 stay in an inpatient mental health unit, Seri and Douglas

told Germano that he could choose between a single cell on the bottom tier, or having a cellmate on the top tier. *Id*. at ¶ 117. Because Germano's mental condition precluded him from having a cellmate, he was forced to choose the bottom-tier cell. *Id*. Douglas told Germano that he could make a list of the inmates who came to his door, and if he could show a problem he would be allowed to move to the top tier. *Id*. at ¶ 118. She said that this information would be passed along to Kompare. *Id*. When Germano made such a list and showed it to Kompare, Kompare stated that he knew nothing about the deal. *Id*. at ¶ 119. As a result, Germano became distrustful of the prison staff. *Id*.

On November 9, 2007, an infuriated Germano wrote letters to Seri and Douglas. *Id.* at ¶ 120. Seri stated that he did not know about the deal, but Douglas responded that Germano should give his list to the staff, and they would handle the situation. *Id*.

On February 22, 2008, Germano's mother called and complained that he was suicidal. Germano then was taken to an inpatient mental health unit. *Id*. at ¶ 158. He remained there for a short period of time, and then was transferred back to C-block. *Id*. at ¶ 166. Germano's mother emailed Bannish on March 4, 2008, warning that Germano would not be safe in his current housing situation, but Bannish failed to respond. *Id*. at ¶ 165.

Bogdanoff met with Germano on April 15, 2008, and informed him that if he was able to remain incident-free for thirty days in C-unit, Bogdanoff would transfer him to the top tier of G-unit. *Id.* at ¶ 177. On April 24, 2008, Germano wrote to Dzurenda and asked to be moved to the top tier. *Id.* at ¶ 188. On May 19, 2008, Dzurenda stated that Germano cannot live on the top tier of the C-block because, except for the high security walls, all walls faced the outer perimeter. *Id*. at ¶ 185. On May 1, 19, and 20, 2008, Germano wrote to Bogdanoff, who confirmed that

Germano could be moved to the top tier of G-block, but not C-block.  *Id*. at ¶ 189.

In an effort to convince prison officials at Garner that he needed to be on the top tier of the housing unit, Germano requested copies of videotapes showing other inmates coming to the door of his cell and bothering him.  *Id*. at ¶¶ 186-87, 191-93.  Germano wished to show that too much interaction and stimuli exacerbated his mental illness, and that he should not have been placed on the lower level.

Germano's request for videotapes was denied, but in the summer of 2008 Dzurenda assigned Marmora and Palmieri to investigate Germano's housing situation.  *Id*. at ¶¶ 193-94.  Palmieri and Marmora coerced inmates into falsely stating that Germano regularly called other inmates to his cell.  *Id*.  Marmora and Palmieri's actions caused other inmates to alienate Germano.  *Id*.

Throughout the summer of 2008, Germano became increasingly suicidal.  *Id*. at ¶ 197.  Germano made a plan to hang himself on August 8, 2008, but prison officials caught wind of this and transferred him to an inpatient mental health unit.  *Id*.  Germano remained in the unit for almost four months.  *Id*.

On November 20, 2008, Germano was sent to G-unit on a bottom tier, single-cell status.  *Id*. at ¶ 210.  Once there, Germano was told that he must choose a cellmate.  *Id*.

### 3.  *Medical Issues*

When Germano was transferred from an inpatient mental health unit to the C-block, his medical mattress was lost in the move.  *Id*. at ¶ 102.  Castro denied Germano a replacement mattress, even though Germano has chronic degenerative scoliosis.  *Id*.  Germano filed level one and level two grievances, which were denied.  *Id*.  Germano believes Castro's actions can be

traced to a memo sent by Buchanan, which stated that doctors at Garner had been too liberal in doling out medical mattresses.  *Id*. at ¶ 103.

### C.  Retaliatory Incidents

In October 2007, Germano informed Helfand that he was not able to get his medications in a timely manner on Friday mornings because the nursing staff held parties at that time.  *Id*. at ¶ 110.  As a result, Helfand ended the Friday morning nursing staff parties.  *Id*.  A few days later, Malloy informed Germano that she would not renew his single cell status; Germano believes she did so in order to retaliate against Germano for complaining about the parties.  *Id*. at ¶ 111.

### D.  Due Process Incidents

In November 2007, after Germano screamed at Malloy and smashed his television, Puco gave him a disciplinary ticket.  *Id*. at ¶ 131.  Germano says some of the staff who gave him disciplinary tickets had previously attended the nursing staff parties that Germano had gotten canceled (see section III.C).  Germano also alleges that when Social Worker Nick Seri wrote up the event he mentioned that the incident was caused by Germano's mental illness, but made no mention of Germano's illness in the addendum to the report.  *Id*. at ¶¶ 134-35.  Germano states that the failure to mention his mental illness in the addendum was due to a conspiracy on the part of the prison staff.  *Id*.  One prison doctor told Germano he would have the tickets dismissed, but never did.  *Id*. at ¶¶ 138-40.

On April 11, 2008, Germano was given a disciplinary ticket after he threatened a nurse.  *Id*. at ¶ 176.  That ticket was dismissed on April 22, 2008, with the explanation that "Mr. Germano has a severe personality disorder which aggravates the I/M's mental illness to a point he is unable to participate with the D.R. process."  *Id*.  Germano believes this indicates that his

disciplinary ticket from November 16, 2007 should have been dismissed. *Id.*

In November 2008, upon his admission to the G-unit, Germano found that thirty-six of his CDs were missing. *Id.* at ¶ 211. Germano filed a lost property request on December 1, 2008. *Id.* In response, a property officer, under the direction of Dzurenda, told Germano that he could only retain fourteen CDS in his cell per State of Connecticut Department of Correction Administrative Directive 6.10. *Id.* The property officer told Germano that if he failed to pick fourteen CDs, all of the CDs would be discarded. *Id.* Shortly thereafter officials sent all of the CDs to Germano's mother. *Id.* at ¶ 212. Germano's mother sent them back to Garner, at which point Dzurenda had the CDs destroyed. *Id.* Germano believes that it was Palmieri who informed Dzurenda about the number of CDs Germano possessed. *Id.* at ¶ 213.

At some point in February or March 2009, an attorney sent plaintiff psychiatric books to enable him to prepare for civil litigation. *Id.* at ¶ 219. About a month later, Counselor Bethke (who is not named in this litigation) confiscated ten of the books, some of which contained the plaintiff's legal notations. *Id.* Some books were returned to the plaintiff on March 19, 2009. *Id.* at ¶ 220. Germano appealed the books' confiscation, but Dzurenda had already sent the books back to the attorney. *Id.* at ¶ 221. The attorney again attempted to send the books to the plaintiff, but the packages containing the books were opened at Garner, outside the plaintiff's presence, and immediately returned to the attorney. *Id.*

Dzurenda had other legal mail for Germano opened outside Germano's presence in June 2009. *Id.* at ¶ 227. Prison officials denied Germano's grievances regarding the legal mail incident. *Id.*

As a result of all of these incidents, Germano brought claims under 42 U.S.C. §§ 1983, 1985(3), 1986, and 1988, alleging violations of the Eighth and Fourteenth Amendments. Germano also brought state tort claims for assault and battery and intentional infliction of emotional distress.

In the initial review order (doc. #4), the Court determined that Germano had raised claims of deliberate indifference to medical and mental needs and unconstitutional conditions of confinement, in violation of the Eighth Amendment; conspiracy claims; retaliation claims; Fourteenth Amendment due process claims; and pendant state law claims. The Court now also recognizes that the plaintiff has alleged facts which indicate a claim for violation of the First Amendment.

III. **Discussion**

The defendants have moved to dismiss all counts in the amended complaint. They argue that Germano has insufficiently pled his due process claims, his Eighth Amendment mental health claims, his intentional infliction of emotional distress claims, his assault and battery claims, his conspiracy claims, and his supervisory liability claims against Dzurenda, Ottolini, Seri, Strange, Morris, Bush, Castro, and Buchanan. They also argue that, because the federal claims are insufficiently pled, the Court has no supplemental jurisdiction over the state law claims. Finally, the defendants argue that they are entitled to qualified immunity with regards to the Eighth Amendment mental health claims.

A. Eighth Amendment Claim

1. *Deliberate Indifference to Mental Health Needs*

The defendants argue that Germano's claims regarding his mental health treatment fail to

state a claim upon which relief may be granted. For the reasons that follow, the motion to dismiss the Eighth Amendment claims is granted in part and denied in part.

Deliberate indifference by prison officials to a prisoner's serious medical or mental health needs constitutes cruel and unusual punishment in violation of the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Jarecke v. Hensley*, 552 F. Supp. 2d 261, 264 (D. Conn. 2008). Mere negligence will not support a section 1983 claim. "[T]he Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law . . . ." *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003).

Eighth Amendment deliberate indifference has two prongs: one objective and one subjective. Objectively, Germano must show that he suffered from a serious medical need. *Hathaway v. Couglin*, 37 F.3d 63, 66 (2d Cir. 1994), *cert denied sub nom. Foote v. Hathaway*, 513 U.S. 1154 (1995). A serious medical need has been defined by the Second Circuit as an urgent medical condition that causes death, degeneration, or extreme pain. *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (internal citations omitted). A court may also consider whether the medical condition affects the plaintiff's daily activities in a significant manner, and whether a reasonable physician would consider the condition or injury to be important and require treatment. *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). Germano has pled sufficient facts to support a claim that his borderline personality disorder constitutes a serious medical condition. *See Ruffino v. Lantz*, No. 3:08-cv-1521, 2010 WL 908993, at *4 (D. Conn. Mar. 9, 2010) (noting that, for purposes of summary judgment on Eighth Amendment challenge, borderline personality disorder is a "serious psychological condition[].").

Subjectively, Germano must show that the defendants "kn[ew] of and disregard[ed] an

excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Germano must demonstrate "something more than mere negligence," but can succeed by

demonstrating "something less than acts or omissions for the very purpose of causing harm or

with knowledge that harm will result." *Id*. at 835. Germano must show that the defendants were

aware of facts from which they could have recognized the risk of substantial harm to him, and

that they did in fact draw that inference. *Hathaway*, 37 F.3d at 66.

a.   *Incidents Ignoring Suicide Threats (Matthews, Kompare, and Benner)*

Germano's allegations involving his suicide attempts may plausibly constitute deliberate

indifference to his mental needs. Specifically, Germano alleges that Matthews was aware of how

serious his mental health condition was, disregarded his claims that he wanted to hurt himself in

May and June 2007, and failed to alert other mental health staff about those incidents. Similarly,

Germano alleges that in March 2008 Kompare ignored Germano's claims that he felt suicidal,

and shortly thereafter Germano tried to cut an artery in his arm.

These allegations, if true, and with all reasonable inferences drawn in Germano's favor,

may amount to a plausible claim of deliberate indifference to serious mental health needs. *See,*

*e.g., Thomas v. Ashcroft*, 470 F.3d 491, 497 (2d Cir. 2006) (reversing dismissal of prisoner's

complaint that sufficiently alleged defendants ignored his serious medical needs despite being

made aware of them); *Allah v. Kemp*, No. 9:08CV1008, 2010 WL 1036802, at *6 (N.D.N.Y.

Feb. 25, 2010) (denying motion for judgment on the pleadings, and rejecting defendants'

arguments that their failure to take more affirmative steps to prevent plaintiff from attempting

suicide was, at most, a mistake "in their exercise of psychiatric judgment"). Thus, Matthews'

and Kompare's motion to dismiss the Eighth Amendment claims is denied.

For similar reasons, Benner's motion to dismiss is denied. Germano alleges that Benner failed to inform Oliveira about Germano's suicide attempt and covered up the fact that Matthews did not alert anyone after Germano ate a gel packet. Those actions could plausibly constitute deliberate indifference to an excessive risk to Germano's health and safety. Therefore, the motion to dismiss the Eighth Amendment claim against Benner is denied.

### b. *Disagreement with Treatment (Oliveira)*

The plaintiff alleges that on a handful of occasions, Oliveira did not offer him medications when the plaintiff believes it would have been helpful. Oliveira also limited Germano's sessions with Matthews in May 2007, and eventually reassigned Germano from Matthews to Kompare. None of those claims, however, suggest that Oliveira was deliberately indifferent to Germano's mental health needs. Instead, it appears that Germano merely disagrees with the treatment Oliveira provided. Because "a disagreement with the medical care provided is insufficient to state a constitutional claim," *Ventura v. Sinha*, 379 Fed. Appx. 1, 1 (2d Cir. 2010), the Eighth Amendment claim for deliberate indifference against Oliveira is dismissed.

### c. *Supervisory Liability (Bush, Helfand, Strange, Bannish, and Ottolini)*

To recover money damages under section 1983, Germano must show that each defendant was personally involved in the alleged constitutional violation. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). Supervisory officials cannot be held liable under section 1983 solely for the acts of their subordinates. *See Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985). Germano may demonstrate sufficient personal involvement to warrant liability by alleging that (1) the defendant actually and directly participated in the alleged acts; (2) the defendant failed to remedy a wrong after being informed of the wrong through a report or appeal; (3) the defendant created

or approved a policy or custom that sanctioned objectionable conduct that rose to the level of a constitutional violation, or allowed such a policy or custom to continue; (4) the defendant was grossly negligent in his supervision of the correctional officers who committed the constitutional violation; or (5) the defendant failed to act in response to information that unconstitutional acts were occurring.[3]  *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003).

Germano brings claims of supervisory liability against Bush, Helfand, Strange, Bannish, and Ottolini.  As an initial matter, the plaintiff does not allege that all of these defendants were, in fact, supervisors.  For instance, the plaintiff does not allege that either Bush or Helfand supervised any individuals who infringed the plaintiff's constitutional rights.  The motion to dismiss the Eighth Amendment claims against Bush and Helfand, therefore, is granted.

The Eighth Amendment claim against Strange is unavailing.  The only relationship Strange had to the plaintiff's mental health claims is that he trained and supervised Dzurenda, Palmieri, Marmora, and Travaglin.  There is no allegation, however, that his supervision was negligent, let alone grossly negligent, and thus the Eighth Amendment claim against him must be dismissed.

---

[3] The defendants argue that the Second Circuit's traditional factors governing supervisory liability are no longer valid in the wake of *Iqbal*.  It is not clear that the Second Circuit's personal involvement theory was limited by *Iqbal*.  *See D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (holding that *Colon*'s personal involvement analysis still applies in cases of deliberate indifference under the Fourth and Eighth Amendments); *Sash v. United States*, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009) (same).  Even if *Iqbal* has limited the personal liability theory, however, "the Second Circuit has emphasized the importance in providing *pro se* incarcerated plaintiffs with an opportunity to conduct discovery to identify the officials 'who have personal liability.'"  *Sosa v. Lantz*, 3:09cv869, 2010 WL 3925268, at *5 (D. Conn. Sept. 30, 2010) (quoting *Davis v. Kelly*, 160 F.3d 917, 921 (2d Cir. 1998)).

The only personal involvement alleged against Bannish and Ottolini involves correspondence regarding the plaintiff's allegedly unconstitutional treatment. It is clear that in the prison context, the mere *receipt* of letters from an inmate is insufficient to establish personal involvement. *See Mateo v. Fischer*, 682 F. Supp. 2d 423, 430-31 (S.D.N.Y. 2010) (recounting cases in Second Circuit where receipt of letters is insufficient personal involvement). Although there are allegations that Bannish ignored letters and emails from the plaintiff's mother, and a grievance from the plaintiff, that is insufficient to establish liability. Furthermore, although Bannish trained and supervised Ottolini, Matthews, Oliveira, Kompare, Benner, Cassidy, Morris, Bush, Helfand, Douglas, Seri, Malloy, and Puco, there is no allegation that he did so inadequately. The only remaining allegations against Bannish are that he told Matthews to pass Germano's requests along to Kompare, that he came up with a "crisis theory" for Germano in forty-five minutes, and that he recommended Germano join the "start now" group. None of those allegations indicate an excessive risk to Germano's health or safety, and instead only indicate disagreement about the plaintiff's medical treatment. Therefore, the motion to dismiss the Eighth Amendment claim against Bannish is granted.

Finally, Germano alleges that Ottolini did not respond to Germano's mother when she wrote to Ottolini asking for help. Again, unanswered letters are not enough to constitute personal liability, and Ottolini's motion to dismiss the Eighth Amendment claim is granted.

d. *Cell Block Placement (Dzurenda, Douglas, Marmora, Seri, and Palmieri)*

Several of the plaintiff's complaints revolve around his placement in lower-tier cells that were affected by heavy traffic, which he claims increased his mental health problems. Although the plaintiff may have found it irritating to have traffic passing by his cell, it is not plausible that

24

the cell assignment decisions made by the defendants constitute deliberate indifference to an excessive risk to inmate health, or cruel and unusual punishment. The motion to dismiss the Eighth Amendment claim, therefore, is granted for all claims arising from the plaintiff's cell placement.

e. *Antagonizing the Plaintiff (Malloy)*

The plaintiff alleges that in November 2007, Malloy antagonized him by asking him what was troubling him when he went to have his medications refilled. It is not plausible that inquiring about an individual's mood constitutes deliberate indifference to an imminent risk to health or safety. Therefore, Malloy's motion to dismiss the Eighth Amendment claim is granted.

f. *Remaining Defendants (Puco, Morris, Cassidy, and Travaglin)*

The motion to dismiss the Eighth Amendment claims of the remaining defendants is granted, because the plaintiff's allegations against those plaintiffs are cursory at best. For instance, the only Eighth Amendment allegation against Puco is that he told the plaintiff that he could move to C-block, and that Kompare would be his therapist.

The only conduct alleged on the part of Morris is that she assigned Cassidy to work on Germano's housing block, even though she knew there was a no-contact order in place. That conduct does not rise to the level of being deliberately indifferent to Germano's mental health needs. Similarly, none of the conduct alleged against Cassidy or Travaglin rises to the level of an Eighth Amendment violation, because there is no allegation that they knew of and disregarded an excessive risk to the plaintiff's health or safety.

g. *Qualified Immunity*

Defendants contend that they are entitled to qualified immunity with regard to Germano's claims of deliberate indifference to his serious mental health needs.  Qualified immunity is an affirmative defense that shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

To resolve questions of qualified immunity at the motion to dismiss stage, courts consider a two-part test.  "First, a court must decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right.  Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct."  *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815-16 (2009) (internal citations omitted).  To evaluate whether a right is clearly established, the court must determine whether it would be clear to a reasonable correctional official that his conduct in these circumstances was unlawful.  *See Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled on other grounds by Pearson,* 555 U.S 223.

After liberally reviewing the allegations in the amended complaint, accepting all of the allegations as true, and construing them in Germano's favor, it is not possible to conclude that the defendants are entitled to qualified immunity for the claims of deliberate indifference to mental health needs.  During the relevant time period, the law was clear that mental health care must be provided to prisoners under the Eighth Amendment.  *See Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir. 1989) ("We think it plain that from the legal standpoint psychiatric or mental health care is an integral part of medical care.  It thus falls within the requirement of *Estelle v. Gamble* . . . that it must be provided to prisoners.").  Here, because the allegations that state

claims for Eighth Amendment violations allege conduct that was clearly established to be violative of the Eighth Amendment, the objective reasonableness of the defendants' conduct turns "on factual questions that cannot be resolved at [the motion to dismiss] stage of proceedings." *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 793 (2d Cir. 2002). Accordingly, the motion to dismiss on the ground that the defendants are entitled to qualified immunity is denied without prejudice. The defendants may renew the claim of qualified immunity on a motion for summary judgment or at trial.

## 2. *Deliberate Indifference to Medical Needs (Castro and Buchanan)*

The plaintiff's Eighth Amendment medical claim arises from his chronic degenerative scoliosis. As noted above, when determining whether an ailment is a severe medical need, the Second Circuit has considered whether it causes death, degeneration, or extreme pain, *Johnson*, 412 F.3d at 403, whether it affects an inmate's daily activities in a significant manner, and whether a reasonable physician would consider the condition to be important and require treatment, *Chance*, 143 F.3d at 702. At least at the motion to dismiss stage, plaintiff's chronic degenerative scoliosis must be treated as a serious medical ailment. *Cf. Marden v. Myers*, No. 3:02-cv-570, 2007 WL 1114042, at *7 (D. Conn. Apr. 13, 2007) (finding, on motion for summary judgment, issues of material fact regarding whether plaintiff's leg condition causing scoliosis was a serious medical condition).

The plaintiff alleges that Castro refused to give him a new medical mattress when the old medical mattress was lost. If the plaintiff did suffer from a serious medical condition, and his medical mattress was prescribed to address a serious medical need, then Castro's refusal to provide the mattress could constitute an Eighth Amendment violation. Thus, the motion to

dismiss the Eighth Amendment claim against Castro is denied.

Prior to Castro's denial of the medical mattress, Buchanan wrote a memo saying that employees were being too liberal in giving out medical mattresses. There is no indication that Buchanan knew or should have known that the memo would result in a violation of Germano's Eighth Amendment rights.[4] Therefore, the motion to dismiss the Eighth Amendment claim against Buchanan is granted.

### B. Nurse Cassidy Investigation

In 2007, Travaglin conducted an investigation into the plaintiff's relationship with Cassidy. Travaglin did not reprimand Cassidy, but did implement a no-contact order between Germano and Cassidy. Germano contends that Travaglin's investigation was inadequate, because he failed to obtain evidence from witnesses such as his mother and Cassidy's co-worker. He also claims that Dzurenda refused to open Travaglin's investigation, and failed to adequately investigate claims that in July 2007 Cassidy sent him a message via another inmate. The plaintiff also alleges that Dzurenda failed to reprimand Morris for permitting Cassidy to work in his housing unit in December 2007. There are two possible injuries that could arise from the Cassidy incidents: (1) failure to properly investigate and punish Cassidy, and (2) the no-contact order's infringement of the plaintiff's liberty interest without due process of law.[5]

Germano has no constitutionally protected right to a proper investigation of Cassidy's actions. *See Lewis v. Gallivan*, 315 F. Supp. 2d 313, 316-17 (W.D.N.Y. 2004) ("There is . . . no

---

[4] Germano notes that Buchanan was responsible for training and supervising Castro. Because there is no allegation that Buchanan inadequately trained or supervised Castro, that claim alone would not be enough to give rise to Eighth Amendment liability.

[5] This latter theory will be discussed in full in Part III.C, *infra*.

constitutional right to an investigation by government officials.") (internal quotation marks and citations omitted); *Santossio v. City of Bridgeport*, No. 3:01-cv-1460, 2004 WL 2381559, at *4 (D. Conn. Sept. 28, 2004) ("[T]he United States Constitution does not grant plaintiffs a right to an adequate investigation or adequate after-the-fact punishment."). Furthermore, Germano has no constitutional right to have a correctional employee reprimanded or disciplined. *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 768-69 (2005) (victim of crime has no procedural or substantive due process interest in investigation or prosecution of perpetrator); *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); *Osuch v. Gregory*, 303 F. Supp. 2d 189, 194 (D. Conn. 2004) (finding "no federal constitutional right to have disciplinary proceedings instituted against" Connecticut State Trooper or Public Defender).

Because Germano has no right to an investigation by Travaglin or Dzurenda, and has no right to have Morris or Cassidy disciplined, his claims of inadequate or improper investigations and the refusal to reprimand Cassidy and Morris fail to state a claim upon which relief may be granted. The motion to dismiss those claims is granted.

C. Due Process Claims

The defendants argue that Germano's due process claims should be dismissed for failure to state a claim upon which relief may be granted. Germano lists a number of possible due process violations: (1) the issuance of disciplinary tickets, (2) the no-contact order between Germano and Cassidy, (3) the occurrence in which legal books were confiscated and mail was

opened, (4) the occurrence in which Germano's CDs were first confiscated and then destroyed, and (5) failure to respond to grievances.[6]

### 1. *Destruction and Confiscation of Property Claims*

The Supreme Court has held that due process is not violated where a prison inmate loses personal belongings due to the negligent or intentional actions of correctional officers if the state provides an adequate post-deprivation compensatory remedy. *See Hudson v. Palmer*, 468 U.S. 517, 531 (1984); *Parratt v. Taylor*, 451 U.S. 527, 543 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986). The State of Connecticut provides an adequate remedy for the kind of deprivation Germano describes. *See* Conn. Gen. Stat. § 4-141, *et seq.* (providing that claims for payment or refund of money by the state may be presented to the Connecticut Claims Commission). This state remedy is not rendered inadequate simply because Germano anticipates a more favorable remedy in federal court, or because it may take longer for the claim to be resolved in the state system. *See Hudson*, 468 U.S. at 535. Instead, to state a cognizable federal claim, Germano must show that he has been denied an opportunity to attempt to redress the alleged wrong through legal procedures. *See Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 473 (S.D.N.Y. 1998) (where state law provides adequate remedy, claims for loss of personal property not cognizable under section 1983).

---

[6] Germano also states that his due process rights were violated because of the insufficient investigation conducted in the Cassidy incident. As noted above, the plaintiff has no constitutional right to an investigation. The plaintiff also lists the denial of a medical mattress, the decision to terminate his therapy, and the decision to house him on the bottom tier, as due process violations. Those allegations are better analyzed under the Eighth Amendment.

Germano has not alleged that an adequate post-deprivation remedy was unavailable to him, or that he was unable to utilize that remedy. Thus, the motion to dismiss is granted with respect to Germano's destruction of property claims.[7]

### 2. *Failure to Respond to Grievances*

Germano alleges that on several occasions officials failed to respond to grievances he filed. It is well-established that "[i]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim." *Shell v. Brzesniak*, 365 F. Supp. 2d 362, 370 (W.D.N.Y. 2005). Accordingly, the motion to dismiss is granted for claims that the defendants failed to respond to the plaintiff's grievances.

### 3. *No-Contact Order*

The plaintiff also appears to allege a procedural due process violation arising from the no-contact order he was given as a result of the Cassidy investigation. The plaintiff alleges that he was having a relationship with Cassidy. It is difficult to imagine what liberty or property interest the defendants unlawfully destroyed without process. A prisoner conducting a relationship with a prison employee presents a clear security risk, and because the plaintiff does not deny the relationship, it was not unconstitutional for the prison to have instituted a no-contact order between Cassidy and Germano without notice or a hearing. Therefore, Travaglin's motion to dismiss procedural due process claims arising from the no-contact order is granted.

---

[7] Liberally construed, the plaintiff's allegation that Dzurenda confiscated his books may constitute a First Amendment violation. The defendants do not contest that claim.

Because the defendants did not address Germano's claims that they violated his due process rights in connection with the issuance of disciplinary reports/tickets, or through the opening of his mail, the motion to dismiss is denied without prejudice with respect to those claims.[8]

D.  Conspiracy Claim

Defendants argue that the plaintiff's claims of conspiracy are conclusory and should be dismissed.  To prevail on a motion to dismiss a section 1983 conspiracy claim, Germano must allege "(1) an agreement between two or more state actors; (2) to act in concert to inflict an unconstitutional injury on the plaintiff; and (3) an overt act done in furtherance of that conspiracy causing damages."  *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (internal citations omitted).  "A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983).

Germano's general allegations that defendants conspired to violate his due process rights are conclusory and fail to state a viable claim of conspiracy.  Additionally, his claims that Dzurenda and Travaglin conspired to perform inadequate investigations into the Cassidy incidents is unavailing, because there is no constitutional right to an investigation by government officials.  Similarly, the plaintiff's allegation that the termination of his therapy with Matthews constituted a conspiracy is unavailing, because the termination of his therapy does not constitute

---

[8] For Cassidy, Oliveira, Matthews, Palmieri, Kompare, Benner, Bannish, Ottolini, Strange, Morris, Bush, Helfand, Douglas, Malloy, Travaglin, Buchanan, and Castro, no facts are alleged that could be construed as a due process violation, and thus their motion to dismiss any due process claims against them is granted.

a constitutional violation unless it rises to the level of an Eighth Amendment claim. Some of the plaintiffs other claims, however, could plausibly constitute a conspiracy.

1. *Retaliation Conspiracies*

Germano alleges that in November 2007, Malloy, Puco, Marmora, and Seri conspired to cause him to lose control, and then issued him two disciplinary tickets. Germano claims that defendants should have dismissed those disciplinary tickets due to his mental illness, but failed to do so. Germano alleges that this conduct occurred after he had caused the nurses' Friday morning parties to be terminated, which suggests an allegation of First Amendment retaliation.

"[T]o sustain a First Amendment retaliation claim, a prisoner must demonstrate the following: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (internal quotation marks omitted). Here, the alleged protected speech is the plaintiff's complaint to Helfand that the nursing parties were interfering with the nurses' duties to inmates. The adverse action was baiting the plaintiff into actions that would justify the issuance of disciplinary tickets. Those allegations state a claim of conspiracy to retaliate against the plaintiff, and the motion to dismiss is denied.

Germano also claims that on December 20, 2007, his mother complained to Boutin regarding his mental health care and the incident with Cassidy. Germano alleges that Boutin then called Morris, and that as a result, on December 21, 2010, Morris decided to permit Cassidy to work in his housing unit despite the no-contact order between Cassidy and Germano. The

plaintiff also alleges that Dzurenda spoke with Cassidy on December 21 and failed to move her, despite the no-contact order. Plaintiff believes there was a conspiracy between Dzurenda and Morris. Those allegations are conclusory, however, and Dzurenda and Morris's motion to dismiss the conspiracy claims are granted.

2. *Eighth Amendment Conspiracy*

As noted above, Germano has alleged that, because of his mental health issues and the amount of traffic by his bottom-tier cell, he should have been assigned to a top-tier cell. When Palmieri and Marmora were assigned to investigate Germano's cell situation, they allegedly coerced inmates into testifying they came to Germano's cell frequently because Germano called them there. Because those allegations do not constitute an Eighth Amendment violation (*see* section III.A.1.d), Palmieri and Marmora's motion to dismiss the Eighth Amendment conspiracy claim is granted.

Lastly, Germano alleges that in October 2007, Douglas and Seri informed him that he had to choose between a single cell on the lower tier and a cell with a cellmate on the upper tier. Germano chose the single cell on the lower tier, but asked Douglas if he could be moved to the upper tier at a later date. Douglas said she would speak to Kompare about the matter.

When Germano gave Kompare the list of inmates who had come to his cell over a week's time, Kompare indicated that he was unaware of Germano's conversation with Douglas. Seri was also unaware of the discussion between Douglas and Germano. These allegations do not demonstrate that Seri, Douglas, and Kompare entered into an agreement to violate Germano's constitutional rights with respect to his request to be moved to the upper tier. Thus, this allegation fails to state a valid conspiracy claim.

For the reasons stated above, the motion to dismiss the conspiracy claims is denied with respect to Seri, Malloy, Puco, and Marmora. The motion to dismiss the conspiracy claims is granted with respect to Dzurenda, Cassidy, Oliveira, Matthews, Palmieri, Kompare, Benner, Bannish, Ottolini, Strange, Morris, Bush, Helfand, Douglas, Travaglin, Buchanan, and Castro.

    E.  <u>Supplemental Jurisdiction</u>

Defendants argue that the Court should dismiss the state law claims against those defendants whose federal claims have been dismissed. A court has discretion to decline to exercise jurisdiction over state law claims after it has dismissed all federal claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction); *WWBITV, Inc. v. Vill. of Rouses Point*, 589 F.3d 46, 52 (2d Cir. 2009). All federal claims against defendants Cassidy, Oliveira, Palmieri, Bannish, Ottolini, Strange, Morris, Bush, Helfand, Douglas, Travaglin, and Buchanan have been dismissed. The Court declines to exercise supplemental jurisdiction over those defendants, and all state claims against them are dismissed without prejudice.

    F.  <u>Intentional Infliction of Emotional Distress Claim</u>

To prevail on a claim of intentional infliction of emotional distress, Germano must establish four elements: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the

plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe."[9]
*Diamond v. Yale Univ.*, 66 Conn. App. 764, 765-66 (2001) (internal quotations omitted).  The
question whether any defendant's conduct is "sufficient to satisfy the requirement that it be
extreme and outrageous is initially" a determination for the court.  *Appleton v. Bd. of Educ. of
Stonington*, 254 Conn. 205, 210 (2000).

The Connecticut Supreme Court has defined extreme and outrageous conduct as that
which "exceeds all bounds usually tolerated by decent society."  *Carrol v. Allstate Ins. Co.*, 262
Conn. 433, 443 (2003) (internal citation omitted).  "Liability has been found only where the
conduct has been so outrageous in character, and so extreme in degree, as to go beyond all
possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized
community."  *Id*.  The conduct must be such that "recitation of the facts to an average member of
the community would arouse his resentment against the actor, and lead him to exclaim,
'Outrageous!'"  *Id*.

### 1.  *Castro*

The allegation against Castro is that he failed to give the plaintiff his necessary medical
mattress.  Failure to provide a medical mattress is not conduct "so outrageous in character, and
so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as
atrocious, and utterly intolerable in a civilized community."  *Appleton*, 254 Conn. at 210-11.
The plaintiff also has failed sufficiently to allege that the emotional distress the lack of a medical

---

[9] In his opposition to the defendants' motion to dismiss the intentional infliction of
emotional distress count, the plaintiff only discusses the actions of Cassidy and those defendants
who terminated his sessions with Matthews.  The Court will assume, however, that he intended
to bring an intentional infliction claim against all defendants.

mattress caused him was severe.  Therefore, Castro's motion to dismiss the claims of intentional infliction of emotional distress is granted.

### 2.  *Matthews and Kompare*

Germano alleges that Matthews and Kompare ignored his threats to commit suicide. Several factors make the conduct at issue here more likely to constitute the intentional infliction of emotional distress.  One is the position of authority the defendants had over the plaintiff. "The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests."  *Delise v. Metro-North R. Co.*, 646 F. Supp. 2d 288, 292 (D. Conn. 2009) (internal quotation marks omitted).  The other factor is the plaintiff's mental illness. "The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity.  The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know."  *Id.*

Matthews and Kompare, as Germano's therapists, were in a position of authority of the plaintiff, and were particularly aware of his mental health problems.  Connecticut courts, however, have been unwilling to hold defendants liable for failing to stop a suicide of which they had notice.  *See Giard v. Town of Putnam*, No. CV085002754S, 2008 WL 5481273, at *10-11 (Conn. Super. Dec. 3, 2008) (no intentional infliction of emotional distress when defendants failed to stop decedent's suicide, despite that decedent announced he was going to kill himself). In *Giard*, the Court reasoned that intentional infliction of emotional distress had not occurred in part because there had been no "affirmative misbehavior."   Here, too, there has been no

allegation of affirmative misbehavior.  Matthews and Kompare did not purposefully harm the plaintiff; they merely failed to take seriously his threats of suicide.  Those actions are insufficient to constitute intentional infliction of emotional distress, and therefore their motion to dismiss is granted.

### 3.  *Benner*

Most of the allegations against Benner revolve around her failure to inform Oliveira about the plaintiff's suicide attempt.  But the plaintiff also alleges that he had a hostile relationship with Benner, and that on November 3, 2008, when Germano asked to have music turned down, Benner turned it up full volume.

Although it is possible that prolonged excessive noise known to be harmful to the plaintiff could support a claim of intentional infliction of emotional distress, *cf. Green v. D'Andrea*, No. CV 000071322S, 2002 WL 321953, at *3 (Conn. Super. Feb. 14, 2002) (denying summary judgment where defendant knowingly conducted extremely noisy commercial activities every day from 6:30 A.M. to 10:30 P.M. next door to plaintiffs), one instance in which Benner turned up the volume on a CD player does not plausibly allege intentional infliction of emotional distress, particularly because the encounter lasted no more than fifteen minutes, and could not possibly be extreme and outrageous.  Nor could it cause severe emotional distress.  The motion to dismiss this claim is granted.

### 4.  *Dzurenda*

As noted above, the plaintiff has alleged that Morris and Dzurenda conspired to assign Cassidy to work near Germano, knowing that there was a no-contact order between the two.

Although that conduct, if true, is mean and petty, it is not extreme and outrageous. Therefore, Dzurenda's motion to dismiss the intentional infliction of emotional distress claim is granted.

### 5. *Malloy, Puco, Marmora, and Seri*

The plaintiff has also alleged that, in order to retaliate against the plaintiff for having their nursing parties canceled, Malloy, Puco, Marmora, and Seri conspired to antagonize him into losing control, and then issued him two disciplinary tickets. The plaintiff's temporary experience of losing control is not enough to constitute "emotional distress." As such, Malloy, Puco, Marmora, and Seri's motion to dismiss the intentional infliction of emotional distress claim relating to that incident is granted.

### 6. *Marmora*

The plaintiff has alleged that Marmora coerced inmates into testifying against Germano in order to prevent Germano from being moved to more appropriate housing. Although Germano was likely disappointed that his housing situation was not remedied, his disappointment does not constitute the kind of emotional distress necessary for a successful claim of intentional infliction of emotional distress. The alleged conduct, though unprofessional, is not extreme and outrageous, and the motion to dismiss that claim is granted.

### G. Assault and Battery Claim

Germano alleges that defendants committed assault and battery against him by intentionally or recklessly causing him severe (self-inflicted) injuries. A civil assault is defined as "the intentional causing of imminent apprehension of harmful or offensive contact with another." *Dewitt v. John Hancock Mutual Life Ins. Co.*, 5 Conn. App. 590, 594 (1985). The Connecticut Supreme Court has held that "[a]n actor is subject to liability to another for battery if

(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." *Alteiri v. Colasso*, 168 Conn. 329, 334 n.3 (1975).

There are no allegations in the amended complaint that any of the defendants had any contact with Germano that could be construed as constituting an assault or battery. Because of the absence of allegations that the defendants intended to create any harmful or offensive contact with Germano, the motion to dismiss all assault and battery claims is granted.

### H. Official Capacity and Section 1985, 1986 and 1988 Claims

In the initial review order addressing allegations in the complaint, the Court dismissed the claims asserted under 42 U.S.C. §§ 1985, 1986 and 1988 pursuant to 28 U.S.C. § 1915A(b)(1), and dismissed the claims for money damages against the defendants in their official capacities as barred by the Eleventh Amendment. (*See* Initial Review Or. at 2-4.) Germano has raised the same claims in the amended complaint. Accordingly, for the reasons set forth in the Court's Initial Review Order [Doc. # 4], the claims in the amended complaint asserted under 42 U.S.C. §§ 1985, 1986 and 1988 are dismissed pursuant to 28 U.S.C. § 1915A(b)(1), and the claims asserted against the defendants in their official capacities for money damages are dismissed pursuant to 28 U.S.C. § 1915A(b)(2).

## IV. Conclusion

Defendants' motion to dismiss [**Doc. #20**] is **GRANTED** for all claims in the amended complaint against defendants Cassidy, Oliveira, Palmieri, Bannish, Ottolini, Strange, Morris, Bush, Helfand, Douglas, Travaglin, and Buchanan; all Eighth Amendment claims against

Dzurenda, Seri, Malloy, Puco, and Marmora; the due process claims against Matthews, Kompare, Benner, Malloy, and Castro; the conspiracy claims against Dzurenda, Matthews, Kompare, Benner, Marmora (for the Eighth Amendment conspiracy), Seri (for the Eighth Amendment conspiracy), and Castro; all claims for intentional infliction of emotional distress; and all assault and battery claims.

The motion to dismiss is **DENIED** for the Eighth Amendment claims against Matthews, Kompare, Benner, and Castro; the due process claims against Dzurenda, Seri, Puco, and Marmora; and the conspiracy claims against Seri (for the retaliation conspiracy), Malloy, Puco, and Marmora (for the retaliation conspiracy).

The claims in the amended complaint asserted under 42 U.S.C. §§ 1985, 1986 and 1988 are dismissed pursuant to 28 U.S.C. § 1915A(b)(1) and the claims asserted against the defendants in their official capacities for money damages are dismissed pursuant to 28 U.S.C. § 1915A(b)(2).

It is so ordered.

Dated at Bridgeport, Connecticut, this 28th day of March 2011.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge